RIPLEY NATIONAL BANK v. CONNECTICUT MUTUAL LIFE INSURANCE COMPANY et al.; SIBERT, Appellant.

Division One, June 22, 1898.

1. **Deed of Trust**: RELEASE: BY WHOM MADE. A deed of trust to secure a note made payable to T. & N., and by them indorsed to respondent, can be released only by respondent.

2. **Bank Deposit:** ORAL ORDER FOR APPLICATION: AGENCY: CONVERSION BY CASHIER. Money deposited in a bank may be paid out on the oral order of the depositor, but when the bank acts upon such order it does so in obedience to such order and as agent of the depositor, and not as agent of the payee of the order. And if the cashier of such bank, instead of obeying such order to transmit the given amount of money to the real holder of the depositor's note, transfers the money to his own account as cashier and then converts it to his individual use, the depositor can not claim that the debt due the holder of his note has been paid, although such cashier was himself the original payee.

3. ———: ———: ———: ———: RELEASE OF DEED OF TRUST: CASE STATED. Appellant executed his note for $3,365.23 to Thompson and Newkirk, cashier and president of a Sedalia bank, and they indorsed the note to an Ohio bank. The note was secured by a deed of trust, and after it became due appellant borrowed from an insurance company $9,000 to pay off said note and other debts, and deposited the money in the Sedalia bank and directed the cashier to apply the money to the payment of these obligations. On the same day Newkirk and Thompson wrote a release on the margin of the record, Thompson at the time showing a forged note which was an exact copy of the one set out in the deed of trust, and thereby inducing the recorder to certify that the note was "produced and canceled." The Ohio bank knew nothing of this release, but the appellant had directed Thompson to obtain the note and authority to make the release, and on inquiry of the recorder was informed that the release had been properly made. Thompson transferred the amount of the note to his account as cashier, and then to his individual account, and continued to remit the interest until the bank failed about five months later, the appellant supposing until ten days thereafter that the note had been paid. *Held*, that, as the evidence failed to show any authority from the Ohio bank to Thompson to receive payment of the debt, the appellant's defense of payment must fail, and the insurance company's mortgage must be considered subject to the deed of trust given to secure the note held by the Ohio bank.

*Appeal from Pettis Circuit Court.*—HON. RICHARD
FIELD, Judge.

AFFIRMED.

*John Cashman* and *W. S. Shirk* for appellant.

(1) The entire evidence taken together proves the agency that estops the plaintiff from now denying

payment of the debt. *Gibson v. Zeibig,* 24 Mo. App. 65; *Franklin v. Ins. Co.,* 52 Mo. 461; *Brooks v. Jamison,* 55 Mo. 512; *Edwards v. Thompson,* 66 Mo. 482; *Mitchum v. Dunlap,* 98 Mo. 418; *Hull v. Jones,* 69 Mo. 587; *Wheeler v. Mfg. Co.,* 23 Mo. App. 190; *Greeley-Burnham Grocer Co. v. Capen,* 23 Mo. App. 306; *Gibson v. Zeibig,* 24 Mo. App. 67; *Woolen Mills v. Meyers & Co.,* 43 Mo. App. 124; *Flint-Walling Mfg. Co. v. Ball,* 43 Mo. App. 505; *Sharp v. Knox,* 48 Mo. App. 169; *Hoppe v. Saylor,* 53 Mo. App. 4; *Lumber Co. v. Ballentine, Foster & Co.,* 54 Mo. App. 172. When an agency is shown to exist, the presumption would be that the agent's authority was general rather than limited. *Sharp v. Knox,* 48 App. 169. (2) If the debt is paid, then the release follows as a matter of right. R. S. 1889, sec. 7095; *Verges v. Gibney,* 47 Mo. 171. (3) The doctrine of estoppel does not apply in this case as against the defendant M. H. Sibert. No man can set up another's act or conduct as the ground of an estoppel, unless he has been misled or deceived thereby. In this case Mr. Galbreath had declared his intention to have nothing to do with the deposit created by the collection of the debt due the plaintiff. The evidence shows that Mr. Sibert only accepted the certificate after being urged by the receiver to accept the same so as to save the money to some one, and after Mr. Galbreath had refused to further recognize his then wrecked, but long-trusted depository. The placing the certificate with other paper in the Bank of Commerce did not change the right to ownership in the plaintiff. It being once stamped with the indicia of a trust relation, this relation followed it through all its course, and Mr. Sibert will be compelled to account for it, as trustee, no matter the manner of his dealings with it. No harm having been done to plaintiff by any act of Mr. Sibert, and plaintiff now being tendered the proceeds of the

deposit, placing it in exactly the same position it was before the bank failed, there is no application of the doctrine of estoppel in this case. *Blodget v. Perry*, 97 Mo. 263; *St. Louis v. Lumber Co.*, 98 Mo. 613; *State ex rel. v. Sitlington*, 51 Mo. App. 252; *Reichla v. Gruensfelder*, 52 Mo. App. 43.

*Sangree & Lamm* for respondent.

(1) Plaintiff can sue in equity to remove the shadow and menace of the Rowse deed of trust, and reestablish its own and the lien thereof. *Seitz v. Dunning*, 8 Mo. App. 208; *Valle's Adm'x v. American Iron Mountain Co.*, 27 Mo. 463; *Douglas v. Douglas Bagging Co.*, 94 Mo. 226; 2 Jones on Mortg. [3 Ed.], sec. 966. (2) The answer pleads payment of our note to an alleged authorized agent—one Thompson. The record does not sustain such defense. *First.* Because, neither Thompson, Newkirk nor The First National Bank had the custody of the note in question at the time of the alleged payment, and hence defendant dealt with them, or either of them, at his own peril under such circumstances. 2 Jones on Mortg. [3 Ed.], sec. 956; *Tappan v. Morseman*, 18 Iowa, 499; *Padley v. Neill*, 134 Mo. 364; *Cummings v. Hurd*, 49 Mo. App. 139; *Murphy v. Barnard*, 162 Mass. 72; *Englert v. White*, 92 Iowa, 97; *Trowbridge v. Ross*, 105 Mich. 598; *Joy v. Vance*, 104 Mich. 97; *Ilgenfritz v. Ins. Co.*, 81 Fed. Rep. 27. *Second.* Because, payment of interest by Sibert, from time to time, to the First National Bank, did not make such bank plaintiff's agent to collect the principal. *Brewster v. Carnes*, 103 N. Y. 556; *Klindt v. Higgins*, 64 N. W. Rep. 414; *Western Security Co. v. Douglas*, 44 Pac. Rep. 257; *Stark v. Olsen*, 63 N. W. Rep. 37; *Bank v. Rice*, 67 N. W. Rep. 165; *Powers v. Ins. Co.*, 83 Hun. 254. *Third.* Because, the note's being payable at the First National

Bank does not alter the right of the indorsee for relief, where the money is deposited after due, as here. *Ward v. Smith*, 7 Wall. 447; *Cummings v. Hurd*, 49 Mo. App. 139; *Williamsport Gas Co. v. Pinkerton*, 95 Pa. St. 62; *Wood & Co. v. Trust Co.*, 41 Ill. 267; *Glatt v. Fortman*, 120 Ind. 384; *Adams v. Imp. Com.*, 44 N. J. L. 638; *Cheney v. Libbey*, 134 U. S. 69. *Fourth.* Because, the First National Bank, under the circumstances disclosed by the record, was the agent of Sibert. The relation of depositor and depository existed between them, and, as he unfortunately trusted the bank, he must now bear the resulting hardship and loss. *Ward v. Smith*, 7 Wall. 447; *Adams v. Hackensack Imp. Com.*, 44 N. J. L. 638; *Trowbridge v. Ross*, 105 Mich. 598. *Fifth.* Because, there was no pretense that Mr. Sibert ever knew of these letters until they were read on the stand. He could not, therefore, rely on them and be led thereby into trusting any one as our general agent. *Crane v. Gruenewald*, 120 N. Y. 274; *Leu v. Mayer*, 34 Pac. Rep. 969; *Lawson v. Nicholson*, 31 Alt. Rep. 386. (3) But from any point of view, Mr. Sibert, by treating the deposit as his own and by having it allowed to him by the receiver of the defunct bank, after knowledge of all the facts, and then by transferring the same as collateral security for a loan, elected to treat the money as his own deposit, and not as a payment on our note, and he is now estopped to change positions; for the two are repugnant. He must abide his election. *Drew Glass Co. v. Baldwin*, 27 Mo. App. 44; *Stoller v. Coats*, 88 Mo. 514; *Bank v. Burt*, 93 N. Y. 233; *Nansen v. Jacob*, 93 Mo. 344; *Fox v. Windes*, 127 Mo. 502.

BRACE, P. J.—On the first day of August, 1893, M. H. Sibert, one of the defendants in the above entitled cause, by his deed of that date, in which his wife joined, conveyed a tract of land, containing one hun-

dred and twenty acres, described in the petition, and situate in Pettis county, to John Montgomery, Jr., in trust to secure the payment of a promissory note in words and figures as follows:

"$3,365.23.          SEDALIA, Mo., July 21, 1893.

"Four months after date I promise to pay to the order of C. Newkirk and J. C. Thompson, at the First National Bank of Sedalia, Mo., thirty-three hundred and sixty-five and twenty-three hundredths dollars, for value received, negotiable and payable without defalcation or discount, with interest from date at the rate of eight per cent per annum.

"H. M. SIBERT."

This deed of trust was filed for record in the office of the recorder of said county on the nineteenth of August, 1893, and duly recorded in Book 100 at page 133. Afterward the following release was entered upon the margin of said record of said deed of trust:

"The note herein mentioned having been fully paid, satisfaction of the deed of trust is hereby acknowledged.   Dec. 8th. 1893.

"C. NEWKIRK.

"J. C. THOMPSON."

"Note produced and canceled.

"Attest:  J. H. PILKINGTON, Recorder."

On the same day, December 8, 1893, there was filed for record in the office of the recorder of said county and duly recorded, a deed of trust duly acknowledged and delivered by the said M. H. Sibert and his wife, whereby they conveyed the same with other lands, the whole containing six hundred and forty acres, to E. W. Rowse, in trust to secure the payment of a principal promissory note for $9,000, payable five years after date, and ten interest notes each for $270, payable half yearly, to the Connecticut Mutual Life Insurance Company.

Afterward on the eighteenth of May, 1894, this suit was instituted by the respondent bank, against said insurance company, Rowse, Pilkington, Montgomery, M. H. Sibert and Louise Sibert his wife, charging in the petition, that the said promissory note before due and for full value was indorsed by the said J. C. Thompson and C. Newkirk and delivered to the plaintiff bank, which is now and ever since has been the owner thereof; that the same remains due and unpaid; and that said deed of trust was also delivered to plaintiff and has since remained in its hands, a subsisting and valid security for said note; that the said Newkirk and Thompson, without any power so to do, or any knowledge of or authority from the plaintiff bank, assumed wrongfully to release said deed of trust on the margin of the record thereof; that said marginal release falsely certified that said note was paid, and that said release was attested by the recorder who certified that the note was at the time produced and canceled, all of which was untrue; that by the filing of the Rowse deed of trust on the same day, the same became apparently but wrongfully a prior lien of record on said one hundred and twenty acres of land, when it should of right be a lien subsequent and inferior to plaintiff's deed of trust; and praying a decree that the pretended release be canceled, and that the lien of the Rowse deed of trust be postponed and made subject to the other, and for general relief. The defense set up by the defendant Sibert in his answer to the petition, is payment of the note in full to J. C. Thompson, who, it is therein alleged, was at the time the agent of the plaintiff, duly authorized to receive payment of the same, upon which, issue was joined by reply. The answers of the other defendants do not appear in the record. Upon the hearing the issues were found for the plaintiff bank, and a decree entered in accordance with the prayer of the

petition, from which the defendant Sibert alone appeals.

It appears from the evidence that the plaintiff is a national bank doing business in Ripley, in the State of Ohio, of which W. T. Galbreath was cashier, and G. Bambach was the vice-president and attorney; that the defendant Sibert, a large land owner of Pettis county, Missouri, was, and for many years had been, a customer of the First National Bank of Sedalia, Missouri—frequently needing in his business money, which he obtained from the Sedalia bank (of which C. Newkirk was president and J. C. Thompson cashier) without security, upon notes similar to that hereinbefore set out, which were indorsed by Newkirk and Thompson and forwarded to and discounted by the plaintiff bank. These notes were sometimes paid, and sometimes renewed from time to time, and thus Sibert as maker, and Newkirk and Thompson as indorsers, became indebted to the Ripley National Bank on one or two of these notes overdue, in the sum of $3,625.23 on the twenty-first of July, 1893, in consideration and discharge of which indebtedness Sibert executed the note and deed of trust in question, in pursuance of an arrangement to that effect that day made between him and Mr. Bambach, attorney for the plaintiff bank. Thereupon, Mr. Bambach, delivered up the old note or notes; Newkirk and Thompson indorsed the note in question and the same was delivered to Mr. Bambach for the plaintiff bank, who took the same to Ripley Ohio, and delivered it to the plaintiff bank, to whom the deed of trust, after it was recorded, was also delivered, and both note and deed were in the actual possession of said bank at Ripley in Ohio on the eighth of December, 1893, when the release was entered on the margin of the record at Sedalia by Newkirk and Thompson.

There can be no question on the evidence but that, when the note and deed of trust were thus executed and delivered, Sibert fully understood the exact relation that Newkirk and Thompson sustained to this indebtedness as his indorsers, and to the Ripley National Bank, his creditor, to whom the note had been thus indorsed and delivered. The note fell due November 21, 1893. On the sixteenth of November, 1893, Galbreath, cashier, wrote Thompson, cashier, as follows: "The H. M. Sibert note, $3,365.23, and four months three days interest, is also due November 21–24. I hold it here to hear from you. If he does not get the money as expected to pay it, have him send the interest due for the time as above, $91.97, which will be credited on the note and held longer for time you direct or find necessary; but if he is ready to pay, advise me, and I will send it to you. Note and interest to maturity, $3,457.20."

On the twentieth of that month Thompson cashier answered as follows: "In regard to the Sibert note I would suggest that you hold it for the present. He has applied for a loan on his land with which to take up this, and another note, and I am confident that the loan applied for will be secured. Will probably not know in regard to this before the last of the present week." The note not having been paid at maturity, and protest having been waived by the indorsers, was held by the bank, in pursuance of this request, until the twenty-first of December, 1893, when Galbreath, cashier, in a letter of that date, under the impression that Sibert had failed to secure the contemplated loan, wrote Thompson, cashier, as follows: "We will carry the H. M. Sibert note, $3,457.20, and the 4 months' interest carried with the note to maturity, in amount of $92.07, if he will pay the discount or due interest at once, but can't carry overdue notes without the interest being paid. I mean mortgage notes, in this case particularly." And the

notes and accrued interest still remaining unpaid on the first of January, 1894, Galbreath cashier, inclosed the note and deed of trust, in a letter of that date, addressed to Thompson, cashier, with the following directions: "Now if he will pay the interest accrued to November 24, and for three or four months ahead from November 24, 1893, you can credit the interest on the note accrued and ahead for time named and return the note to us, provided the interest is paid this week; if it is not, we want it collected under your laws governing the sale of real estate held under trust deeds, as we have this year too much paper over-due and are required by the comptroller to collect, renew or sue to collect, so we will be compelled to comply with the requirements of the law."

The receipt of this letter, with stated inclosures, was acknowledged by Thompson, cashier, in his letter of date January 4, 1894, in which he says: "I note your special instruction concerning the M. H. Sibert loan and also that of Gentry's, and have given the parties notice to come in and arrange the interest at once." On the eighth of January he again writes to Galbreath, cashier, "I think I can get the Gentry and Sibert notes fixed to-morrow, so as to reach you by that time (*i. e.*, a couple of days)." Shortly after this the note with interest paid to January 24, 1894, indorsed in pencil in Thompson's handwriting, and the deed of trust, were returned by Thompson, cashier, to the plaintiff's bank, and the amount of the interest remitted to the bank. On the twenty-eighth of February, Galbreath, cashier, wrote Thompson, cashier, and in this letter, after calling his attention to the fact that the interest on the Sibert note was paid only to January 24, 1894, and asking if Sibert was ready to pay the note, he said: "If not we must have the interest at once for say three months from January 24,

1894. Please let me know if I shall send the note and trust deed to you for payment, or for the interest to be paid as above, or can you send your check for the interest, and let me pencil the credit for the interest on the note as you did before?" To which Thompson, cashier, replied by letter of March 3, 1894, "I inclose herein draft for $67.30, interest on the M. H. Sibert note for $3,365." On the seventeenth of April, 1894, Thompson, cashier, in a letter of that date in answer to a letter from Galbreath, cashier, of the fourteenth of April, which does not appear in the evidence, wrote: "I will also attend to the collection of the interest on the Sibert note, and send you the sum covering an extension for perhaps several months," and on the twenty-eighth of April, 1894, wrote Galbreath, cashier, another letter to the same effect, to which Galbreath replied by letter of April 30, calling Thompson's attention to the condition of several overdue notes held by the plaintiff bank for renewal and extension, and among them the Sibert note, "interest ahead since April 24th inst.," and wrote, "all these renewals and extensions we must have fixed at once, so we can get the interest as above, this week." This seems to have closed the correspondence between the plaintiff bank and its correspondent the First National Bank of Sedalia, which within a few days thereafter closed its doors, and went into the hands of a receiver, and Thompson, its cashier, became a fugitive from justice. While the plaintiff bank in Ohio was thus induced to believe by this correspondence that Sibert had failed to secure the contemplated loan, and was therefore unable to pay off the note, but was paying the accrued and accruing interest, in consideration of which the bank continued to hold at Ripley his overdue note and the security therefor for his accomodation, the truth of the matter was that he had through

this same Thompson secured the loan on the eighth of December, 1893, from the Connecticut Mutual Life Insurance Company, to secure which he had executed the aforesaid deed of trust filed for record on that day, and had deposited the same in the First National Bank of Sedalia to his own credit, and Newkirk and Thompson, without any authority from the plaintiff so to do, and without the knowledge or consent of any of its officers, had also on the same day executed the release aforesaid on the margin of the record, and Thompson, and not Sibert, had been paying the interest aforesaid.

It is but justice to the defendant Pilkington the recorder, to say in this connection, that his "attest" to the release, and his stamp to the effect that the note was "produced and canceled," were obtained in this way: Just before noon on the eighth of December, 1893, Newkirk came into the recorder's office and requested the deputy recorder to write the release on the margin of the record, and signed it, saying that Mr. Thompson would bring the note in when he came to sign after dinner. Late in the day Thompson came in, and signed the release, at the same time producing a note, which the recorder compared with the note copied into the deed of trust, and finding the same a literal copy thereof, attested the release and stamped the pretended note "canceled." It appeared clearly upon the trial that this pretended note was a forgery, prepared and produced for the purpose for which it was used, and that the release was executed and the recorder's attestation was procured, while the genuine note was in the plaintiff's bank in Ohio. It is perhaps also due to Mr. Sibert, to give his version of his connection with this whole matter. It can be done most briefly by his deposition taken before the trial and introduced by the plaintiff, from which his evidence

when examined on the trial in his own behalf, did not materially differ: "My name is M. H. Sibert, my age is fifty-four years, residence Sedalia, Mo. I remember signing note for $3,365 and some cents, dated sometime July, 1893. Said note was due in four months. This note was secured by a deed of trust on 120 acres of my land. This note represented the balance of two other notes which I had taken up. The way I understood the note was, that Mr. Tompson and Mr. Newkirk were to indorse the note; they had been getting me money on my note with their indorsements. Some time in the fall, in November I think, I made application through J. C. Thompson to the Connecticut Mutual Life Insurance Company for money to take up the aforesaid note, and the note I owed J. L. Smith, and a note of $1,400 I owed the First National Bank along in the fall. Mr. Newkirk had come to see me several times and said the Ripley National Bank held a $3,365 note, and he said the Ripley National Bank wanted their money, and Mr. Newkirk said the First National Bank wanted me to pay the note I owed it, the $1,400 one. I was also anxious to pay J. L. Smith, and wished to pay the whole thing off, and for this reason I applied for the loan from the insurance company. The negotiations for the insurance loan was pending for some two or three weeks, and the money came here to Mr. Bothwell several days before the 8th day of December, 1893, as I understood it. The papers were signed on the 8th day of December, 1893; had talked to Mr. Thompson about the note for $3,365, and Mr. Thompson told me on the 8th of December that he had wired for said note, or would wire for the said note. This conversation occurred on the 8th of December or a few days prior thereto. I did not see the note in Mr. Thompson's possession. I did not know the deed of trust was released on the 8th day of December, and

did not expect it to be released until the next day because it was very late on the 8th of December, 1893, when I completed the papers for the loan from the insurance company. Several days after this I asked at the recorder's office, and ascertained there that my deed of trust had been released, and my note had been canceled. I never heard anything more about my note and deed of trust and the release thereof until about ten days after the failure of the First National Bank, when old Mr. Galbreath of the Ripley National Bank spoke to me about it, and I could not imagine what note he was talking about. I had told Mr. J. C. Thompson when I deposited the money in the insurance loan on the 8th day of December, 1893, to send the money and pay off the J. L. Smith note, and the note held by the Ripley National Bank, and when he paid them off, he Thompson, should charge my account in the First National Bank with the amount of this note and turn both notes over to me as vouchers, and I supposed he did so, and I expected to get my notes when I settled with the bank. The first I heard to the contrary was about six weeks after this, when I heard that he had not paid the J. L. Smith note. I got after Thompson about the matter, and by different excuses he put me off, and the matter was delayed until after the failure of the First National Bank, but I never did hear about the Ripley National Bank matter until about ten days or two weeks after the failure of the First National Bank. After the failure of the First National Bank I found out that Mr. Thompson instead of paying off my note to the Ripley National Bank, had taken $3,365 from my account with the First National Bank and put that sum to the credit of the cashier, and then Thompson took this sum from the cashier's account and put it to his individual account. I never knew he had done this and never authorized him to do

so, and never heard of this until after the failure of said bank. I got the receiver to transfer the same back to my account where it belonged, and I filed a claim against the bank for all my deposit, including the above amount, and the receiver allowed me my claim for upwards of $5,600. I put my certificate of allowance up as collateral security and borrowed money on the same from the Bank of Commerce in Sedalia, Missouri, and I used the money to pay off the J. L. Smith note. J. L. Smith had a judgment against me, and this judgment was also assigned to the Bank of Commerce. The Smith judgment was paid off by money I borrowed out of the Bank of Commerce. I have paid the Ripley National Bank nothing, and my idea is that I should only pay the Ripley National Bank the amount of dividend realized on the sum of $3,365 and some cents of my claim as allowed against the First National Bank, that being the sum I left at the First National Bank to pay the said Ripley National Bank."

Mr. Bothwell, the agent of the insurance company to whom the money came for the purpose of consummating the loan, testified: "The abstract of title furnished to me showed that a certain note for about $3,000 made by Sibert to C. Newkirk and J. C. Thompson was secured by a deed of trust on a part of the said land; and I applied to J. C. Thompson to ascertain whether they were ready to receive payment of the note, and to release and satisfy the deed of trust, and asked Thompson whether they were prepared to enter satisfaction and release on the records, and he stated that they were ready to release the encumbrance. Some days later I notified Thompson that I was ready to close the loan, and he stated that he and Mr. Newkirk would enter satisfaction on the deed of trust record. The satisfaction was entered that day, but not in my presence; but I examined the record afterward,

and had the maker of the abstract of title put an entry on the abstract showing that satisfaction was made. Soon afterward I wrote my check or checks for the amount of money that was due on the loan to Sibert. And in my presence he indorsed the check or checks, and handed them to Mr. Thompson in the First National Bank, of Sedalia. I did not see the note made by Sibert to Newkirk and Thompson, but I assumed that the note was at the bank and that it was duly and properly canceled and the satisfaction lawfully made."

Mr. Latimer, the receiver of the Sedalia Bank, who took charge thereof about the fifth of May, 1894, and who was continuously thereafter in charge of its books, papers and assets, to the day of the trial, testified that, "On the 8th of December, 1893, Mr. Sibert had to his credit at said bank about $5,100 as a depositor. On the 10th day of March, 1894 there was transferred to the cashier's account, from the account of M. H. Sibert, the sum of $3,365. After I was appointed receiver I heard from Mr. Galbreath his statement about the Sibert note for $3,365.23 and then I looked the matter up for him and found the transfer of a credit to cashier's account from Sibert's account, dated March 10, 1894. I could find no check drawn by Mr. Sibert to the bank for said sum, and I saw Mr. Sibert about it. He told me that he never drew such a check and never authorized anyone to draw such a check, and never authorized anyone to make such a transfer, and no one was authorized to check against his account, but he had told Mr. Thompson to pay the note and use the paid note as a voucher against the account. I then ordered the amount $3,365 put back to Mr. Sibert's credit from the cashier's account, and it was so done. Mr. Sibert then put up his claim against the bank, after I made up his account, showing and explaining to him that said sum was placed

back to his credit, and it was allowed by me as a claim of July 5th, 1894. He had the benefit of said amount in his claim, and I told him so, and he put his claim in for his deposit on that theory and it was allowed to him. He accepted the claim and transferred it to another party." The receiver's certificate of the proof of the claim dated July 5, 1894, and on the same day assigned by Sibert to Bank of Commerce, was also put in evidence.

The appellant offered as evidence a large number of letters from Galbreath, cashier, to Thompson, cashier, in regard to notes and securities, other than those of Sibert, and having no reference to or connection with his dealings with the plaintiff bank or the Sedalia bank, all of which are set out in the record and after careful examination we find they tended to prove no more than was stated by Galbreath on his cross-examination by appellant's counsel, in language as follows: "The Ripley National Bank for some years prior to December, 1893, rediscounted some paper for the First National Bank of Sedalia, Mo., and such paper was generally sent to the First National Bank of Sedalia, Mo., for collection or renewal. The correspondence in reference to such paper was between J. C. Thompson, as cashier of the First National Bank of Sedalia, Mo., and myself as cashier of the Ripley National Bank. The business of the Ripley National Bank with the First National Bank of Sedalia, Mo., was entirely and exclusively confined to taking notes from the latter bank as rediscounts which were either indorsed by the First National Bank or by J. C. Thompson and C. Newkirk, and when indorsed by them the paper was always sent by them as officers of the First National Bank of Sedalia, Mo., to our bank for discount, and then they would make the draft on us for the net proceeds and send the same through one of their St. Louis correspondent banks.

When such notes matured we would send them to the First National Bank of Sedalia, Mo., for payment, as all the notes were made payable at said bank. When payment was made we did not authorize a deposit of the amount to our credit, but always indorsed the notes for collection and remittance to the Ripley National Bank. Many of the notes I authorized to be renewed, but in every instance this was under special instructions from me as cashier of the Ripley National Bank, and nothing was left to their discretion. The Ripley National Bank never did a general exchange business with the First National Bank of Sedalia, Mo., and neither C. Newkirk nor J. C. Thompson, nor the First National Bank were ever agents for the Ripley National Bank, excepting that the First National Bank of Sedalia, Mo., was used by us to make collections or renew notes which we had taken from them and were made payable at their bank, under special instructions in each particular instance. In every instance I would give special instructions what I wanted the First National Bank to do in regard to the papers sent, and they never had authority except what I gave them specially in each particular instance."

I.   The foregoing, somewhat lengthy and detailed, statement of all the material facts as they appear from the evidence, has been made in order that the real merits of the case might clearly appear, no injustice be done to any of the parties, and the necessity of an extended consideration in this opinion of the argument of counsel for a reversal of the judgment be obviated; for when all the facts are considered and reduced to final expression in the ultimate facts proved, there can be no question as to the legal principles governing the case.

That the respondent as indorsee, and holder of the note, was the real *cestui que trust*, and the only

party authorized by law to release the deed of trust on the margin of the record thereof, is beyond question. Revised Statutes 1889, section 7094. That the release was not executed by the respondent through or by any of its officers or agents acting for it, or by any person assuming to act for it, or in its name, and that C. Newkirk and J. C. Thompson, who signed the release, in their own names and for themselves, had no power to release the deed of trust, is also beyond question. Why then should not this void release be canceled and set aside? The answer to this question returned by the appellant, is that the debt, to secure which the deed of trust was given, has been paid by the appellant, and he is entitled to have satisfaction entered of record formally by the respondent; hence for a court of equity to set aside this false and invalid but apparently lawful entry of satisfaction would be a work of supererogation. Therefore the entry of satisfaction should stand. And in support of this contention and plea of payment, while it is alleged in the answer that payment of the debt was made by the appellant to J. C. Thompson, who it is alleged, was at the time the agent of the appellant, duly authorized to receive the same, in the argument it is sought to be maintained that payment was made to the First National Bank of Sedalia, who it is contended, was the general agent of the plaintiff duly authorized at all times after the maturity of the note to receive payment thereof. How far the evidence falls short of showing that the Sedalia bank was such general agent is apparent upon the face of the statement. But if it could be conceded that the Sedalia bank possessed such authority from the respondent, the concession would avail the appellant nothing for the reason that it plainly appears from the evidence that no payment was ever made to the Sedalia bank, as shown in the statement. The only connection which

the evidence shows or tends to show, that the Sedalia bank had with appellant's money was as his depository, which it became as to the money in question on the eighth of December, 1893, when the appellant, having through his agent, J. C. Thompson, procured the loan from the insurance company, deposited the proceeds to his own credit in said bank. Evidently no payment to plaintiff of its debt, whatever relations existed between it and said bank, can be predicated of this deposit. After the bank at appellant's request had accepted his money and passed it to his credit, the same could not rightfully be paid out by the bank except on appellant's order. Such order is usually given by written check, but doubtless may be given orally and such order would be well enough if the bank chose to take the risk and act upon it, but whenever the bank does act in obedience to such order, it acts for the depositor and not for the payee of the order. Hence if Thompson as cashier had, in pursuance of the appellant's oral request, forwarded to the plaintiff the amount of its debt and charged the same to the appellant's account, he would in so doing have been acting for the appellant in making payment of the debt, and not for the respondent in receiving payment of the debt. But the bank did not by its cashier Thompson, or in any way act upon that order, and appellant's money remained on deposit in the Sedalia bank to his credit and subject to his order until the tenth of March, 1894, when Thompson instead of remitting the amount of respondent's debt to it, at Ripley, and charging the same to appellant's account, as he had been authorized by appellant to do, converted the same to his own use, in the manner shown in the statement, and thus it turned out by the malfeasance of the appellant's own agent, to whom he had given

the power and to whom he had entrusted the duty of paying off this debt, the same was not paid by the appellant, nor by any person for him. The fact that the respondent was lulled into a sense of security by Thompson's letters as cashier and the payment by him of interest on the debt, whilst carrying out this fraud upon the appellant, in no way changes the complexion of the transaction. The evidence not only failed to show any authority from respondent to Thompson as an individual to receive payment of this debt; and that alone, would be decisive of the case, against the appellant upon the issue made by the pleadings if strictly interpreted; but as it also failed to show payment to the Sedalia bank for the respondent, by the appellant or by any person for him, the appellant's defense of payment failed along the whole line, and the court committed no error in its decree and judgment, which is therefore affirmed. All concur except MARSHALL, J., *dissenting*.